IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| Matthew Kravitz and Raphael Allison, individually and on behalf of all others similarly situated,<br><br>          Plaintiffs,<br><br>v.<br><br>INTEL CORPORATION, a Delaware corporation,<br><br>          Defendant. | Civil Action No. _____<br><br>CLASS ACTION<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiffs, Matthew Kravitz and Raphael Allison, by their attorneys, bring this civil action for treble damages, injunctive relief, disgorgement, restitution, and costs of suit, on their behalf and on behalf of all others who indirectly purchased a microprocessor from defendant Intel Corporation ("Intel") in the United States in the last four years. As a result of Intel's unlawful conduct, plaintiffs and the Class (as defined in this Complaint), suffered injury to their property and businesses. For their complaint against defendant Intel, plaintiffs, upon personal knowledge as to their own acts and status, and upon information and belief as to all other matters, allege the following:

### INTRODUCTION

1.     Intel holds a monopoly in the market for microprocessors that run Microsoft Windows and Linux computer operating systems (the "x86 Microprocessor Market"). Intel's market power is evidenced by its approximately 90% share of worldwide total revenues on such microprocessors and its approximately 80% worldwide share of such microprocessor units.

2.     Intel has injured plaintiffs by unlawfully maintaining its monopoly. Intel has maintained its monopoly by forming agreements with Intel customers (for example,

computer manufacturers) and/or coercing Intel customers to refrain from dealing with competitors of Intel. Among other things:

        a.      Intel and its major customers have agreed on exclusive or near-exclusive purchasing deals;

        b.      Intel has conditioned rebates, allowances and market development funding on customers' agreements to limit purchases from competitors or to refuse to purchase from competitors;

        c.      Intel has ensured that customers do not buy any significant volume of x86 microprocessors from competitors by establishing a system of discriminatory, retroactive, first-dollar rebates that are triggered by purchases of Intel microprocessors at high levels;

        d.      Intel has threatened retaliation against customers introducing competitor computer platforms;

        e.      Intel has artificially limited individual and commercial consumers' choice by such practices as establishing and enforcing quotas so that key computer retailers stock mostly, if not only, Intel-powered computers;

        f.      Intel has forced personal computer makers and technology partners to boycott competitor product launches and promotions; and

        g.      Intel abused its market power by forcing on the industry technical standards and products for the purpose of disadvantaging competitors in the marketplace.

        3.      Over the past several years, Intel's conduct with respect to its primary competitor, Advanced Micro Devices, Inc. ("AMD"), has been a key aspect of the maintenance of Intel's monopoly. AMD, which has its principal executive offices at Sunnyvale, California, designs, produces and sells microprocessors, flash memory devices and silicon-based products for use in the computer and communications industries. In April 2003, AMD introduced its Opteron microprocessor, the first microprocessor to take x86 computing from 32 bits to 64 bits -- an advance that allows computer applications to address exponentially more memory, thereby increasing performance and enabling features not possible with just 32 bits. Unlike Intel's 64-bit architecture of the time (Itanium), the AMD Opteron -- as well as its subsequently-introduced

desktop counterpart, the AMD Athlon64 -- offers backward compatibility, allowing personal computer ("PC") users to continue using 32-bit software as they upgrade their hardware. Faced with AMD's superior technology, Intel increased exploitation of its market power to pressure customers to refrain from migrating to AMD's superior, lower-cost microprocessors.

4.    Intel unlawfully took actions to diminish the expected market shares of AMD and other competitors, and prevented them from expanding to reach the minimum efficient economies of scale necessary to compete with Intel. Computer manufacturers continue to buy most of their requirements from Intel, continue to pay monopoly prices, continue to be exposed to Intel's economic coercion, and continue to submit to artificial limits Intel places on their purchases from AMD.

5.    Individual and commercial consumers are injured by this anticompetitive behavior, in the form of inflated PC prices, the loss of freedom to purchase computer products that best fit their needs, and the lack of innovation that only a truly competitive market can deliver. The Japanese Government recognized these competitive harms when on March 8, 2005, its Fair Trade Commission (the "JFTC") recommended that Intel be sanctioned for its exclusionary misconduct directed at AMD. Intel did not contest the charges. The European Commission has also been investigating Intel's marketing practices. In late June 2005, AMD filed antitrust actions against Intel, which made public for the first time numerous anticompetitive practices, many of which are the basis for the allegations of this complaint.

## JURISDICTION AND VENUE

6.    This Court has subject matter jurisdiction under 28 U.S.C. §§ 1331, 1332 (as amended) and 1337, and sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26. The Court also has supplemental subject matter jurisdiction of the pendent state law claims under 28 U.S.C. § 1367.

7.    Venue is proper because Intel Corporation is found in this district within the contemplation of 28 U.S.C. § 1391 (b) and (c), and pursuant to 15 U.S.C. §§ 15, 22 and 26.

## THE PARTIES

8.    Plaintiff Matthew Kravitz is a resident of Wilmington, Delware and has indirectly purchased an x86 microprocessor that was manufactured, distributed and/or sold by Intel during the class period, and was injured by the unlawful, anticompetitive, unfair and deceptive acts alleged in this complaint.

9.    Plaintiff Raphael Allison is a resident of Hudson, New York and has indirectly purchased an x86 microprocessor that was manufactured, distributed and/or sold by Intel during the class period, and was injured by the unlawful, anticompetitive, unfair and deceptive acts alleged in this complaint.

10.    Defendant INTEL CORPORATION is a Delaware corporation with its principal executive offices at Santa Clara, California, and it conducts business both directly and through wholly-owned and dominated subsidiaries worldwide.  Intel and its subsidiaries design, produce, and sell a wide variety of microprocessors, flash memory devices, and silicon-based products for use in the computer and communications industries.

11.    Various individuals, partnerships, corporations and associations, both named and not named as defendants in this complaint (the "co-conspirators"), have participated in the violations of the federal antitrust laws and the laws of the various states for which plaintiffs seek relief, and have performed acts and made statements in furtherance of the conspiracy and/or in furtherance of the anticompetitive, unfair or deceptive conduct.

12.    The acts charged in this complaint have been done by Intel or were ordered or done by Intel's officers, agents, employees, or representatives, while actively engaged in the management of Intel's affairs

## FACTUAL BACKGROUND

### I.    EARLY CONDUCT

13.    A general-purpose microprocessor is an integrated circuit capable of executing a menu of instructions and performing requested mathematical computations at very high speed.  Microprocessors are defined by the their instruction set – a computer's machine language instructions.  Computer operating systems are software programs that perform those

instructions so the computer can perform meaningful tasks. Microprocessors evolved to provide 16-bit capability (the original DOS processors); then sometime later, 32-bit capability (allowing the use of advanced graphical interfaces such as later versions of Windows), and now 64-bit capability.

14. IBM introduced the PC in August 1981. Among a variety of microprocessors developed by Motorola, Zilog, National Semiconductor, Fairchild, Intel and AMD, in the early 1980's, IBM chose the Intel architecture, which utilized what became known as the x86 instruction set (after Intel's naming convention for its processors, *i.e.*, *8086, 80186, 80286, 80386)*, and a compatible operating system offered by Microsoft, known as DOS. AMD has contended that IBM was unwilling to be consigned to a single source of supply, and IBM demanded that Intel license another integrated circuit company to manufacture x86 chips as a second source. AMD, which had worked with Intel before in supplying microprocessors, agreed to abandon its own, competing architecture, and it undertook to manufacture x86 chips as a second source of supply.

15. Intel and AMD entered the 1982 AMD-Intel Technology Exchange Agreement (the "Agreement"), by which each would serve as a second source for products developed by the other, but Intel soon set out to secure an advantage over AMD, sabotage AMD products, and constrain AMD's progress. For example, although Intel was required by the Agreement to send AMD timely updates of its second generation 80286 chip, Intel sent AMD information deliberately incomplete, indecipherable and unusable by AMD engineers.

16. Intel decided in 1984 that Intel would become the sole-source for the promising 80386 chip, but misled AMD (and the public) into erroneously believing that AMD would be a second source. This Intel strategy prevented AMD from competing with Intel and entrenched the x86 family of microprocessors as the industry standard, by maintaining customers' perception that AMD would continue to serve as Intel's authorized second source. Intel was well aware that if computer manufacturers knew Intel intended to sole source its 32-bit product, they would be motivated to select alternative products produced by companies offering second sources. Intel could not preserve the appearance that AMD would second source the 386

if it terminated the Agreement or otherwise disclosed its actual intent. Therefore, Intel stalled negotiations over product exchanges, while at the same time allowing AMD to believe that it could ultimately obtain the 386. This injured competition by deterring and impeding serious competitive challenges to Intel and depriving AMD of the revenues and profits it would have earned from such a challenge.

17.    Intel implemented this secret plan for the purpose of acquiring and maintaining an illegal monopoly in the x86 line of microprocessors, which it did by at least 1987. As was its plan, Intel's conduct drained AMD's resources, delayed AMD's ability to reverse-engineer or otherwise develop and manufacture competitive products, and deterred AMD from pursuing relationships with other firms. In so doing, Intel wrongfully secured the benefit of AMD's marketing skills and talent in support of the x86 line of microprocessors and related peripherals, and secured the benefit of substantial competitively-sensitive AMD information regarding its product development plans. When AMD petitioned to compel arbitration in 1987 for Intel's breach and bad faith, the arbitrator recognized that Intel sought to blunt AMD's effectiveness in the microprocessor marketplace and remove AMD as a competitor.

18.    In 1992, after five years of litigation, the arbitrator awarded AMD more than $10 million, plus prejudgment interest, and a permanent, nonexclusive and royalty-free license to any Intel intellectual property embodied in AMD's own 386 microprocessor, including the x86 instruction set. Confirmation of the award was upheld by the California Supreme Court at *Advanced Micro Devices, Inc. v. Intel Corp.,* 9 Cal.4th 62, 36 Cal.Rptr.2d 581 (1994). According to AMD, the arbitrator expressed the hope that the consequent competition would result in an expanded market with appropriate profit margins and benefit to consumers through lower prices.

## II.    THE SETTING FOR INTEL'S EXCLUSIONARY CONDUCT

19.    After confirmation of the arbitration award, AMD settled its outstanding disputes with Intel in a 1995 agreement which gave AMD a shared interest in the x86 instruction set but required it to develop its own architecture to implement those instructions. Beginning in the late 1990s, AMD committed its resources to innovation. AMD's first x86 chip without Intel

pin-compatibility, the Athlon microprocessor delivered in 1999, advanced past Intel technologically, beat it to market with a new generation Windows microprocessor, and broke the 1GHz speed barrier.

20.     AMD's biggest breakthrough came four years later when it introduced an extension of x86 architecture that took Windows processors into the realm of 64-bit computing. Unlike Intel, which invested billions in its Itanium microprocessor and a new, uniquely 64-bit proprietary instruction set (which, because it was proprietary, would have been a game-ending development for AMD had it become the industry standard), AMD undertook to supplement the x86 instructions to accommodate 64-bit processing while allowing 32-bit software to be run as well. AMD's efforts culminated when, in April 2003, it brought to market its Opteron microprocessor for servers (the workhorse computers used by businesses to run corporate networks, e-commerce websites and other high-end, computationally-intense applications). Opteron was the industry's first x86 backward compatible 64-bit chip. Six months later, AMD launched the Athlon64, a backward compatible 64-bit microprocessor for desktops and mobile computers.

21.     The computing industry hailed AMD's introduction of 64-bit computing as an engineering triumph. Microsoft endorsed AMD's 64-bit instruction set and announced that Windows would support it. Intel then copied AMD's technology for its own 64-bit offerings.

22.     AMD has since extended its AMD64 technology to the balance of AMD's microprocessor line-up (which now includes AMD Athlon 64, AMD Athlon 64 FX, Mobile AMD Athlon 64, AMD Sempron, and AMD Turion64 products). Owing also to AMD's pioneering developments in dual-core processors and its introduction of an improved architecture that speeds up microprocessor communications with memory and input/output devices, AMD has seized technological leadership in the microprocessor industry. Its innovation has won for it over 70 technology leadership and industry awards and, in April 2005, the achievement of being named "Processor Company of 2005."

23.     Intel prevented AMD's market share from keeping pace with AMD's technical leadership. Intel has unlawfully maintained the monopoly IBM bestowed on it and

systematically excluded AMD from any meaningful opportunity to compete for market share by preventing the companies that buy chips and build computers from freely deploying AMD processors; by relegating AMD to the low-end of the market; by preventing AMD from achieving the minimum scale necessary to become a full-fledged, competitive alternative to Intel; and by erecting impediments to AMD's ability to increase its productive capacity for the next generation of AMD's state of the art microprocessors.

## INTEL'S EXCLUSIONARY CONDUCT IN THE x86 PROCESSOR INDUSTRY

### I.    COMPETITIVE LANDSCAPE

24.    Intel has a dominant position in the personal computing industry because the x86 versions of dominant Windows and Linux operating systems have produced a huge installed base of Windows- and Linux-compatible application programs that can only run the x86 instruction set. Non-x86 microprocessors are not reasonably interchangeable with x86 microprocessors because none can run the x86 Windows or Linux operating systems or the application software written for them.

25.    The relevant product market in which to assess Intel's position is x86 microprocessors because a putative monopolist in this market would be able to raise the prices of x86 microprocessors above a competitive level without losing so many customers to other microprocessor manufacturers as to make this increase unprofitable. While existing end-users can theoretically shift to other operating-system platforms, high switching costs associated with replacing existing hardware and software make this impractical. The number of new, first-time users who could choose a different operating-system platform is too small to prevent an x86 microprocessor monopolist from imposing a meaningful price increase for a non-transitory period of time. Computer manufacturers would also encounter high switching costs in moving from x86 processors to other architectures, and no major computer maker has ever done it. In short, demand is not cross-elastic between x86 microprocessors and other microprocessors at the competitive level.

26.    The relevant geographic market for x86 microprocessors in which to assess Intel's position is the United States, a submarket of the worldwide geographic market.

Intel and AMD compete globally and nationally; microprocessors can be easily and inexpensively shipped globally and nationally, and frequently are; and the potential for arbitrage prevents chipmakers from pricing processors differently in different countries or differents parts of the United States.

27.     Intel dominates the worldwide x86 Microprocessor Market.  Over the past several years it has consistently achieved more than a 90% market share as measured by revenue, while AMD's revenue share has remained at approximately 9%, with all other microprocessor manufacturers relegated to less than 1%. Intel has captured at least 80% of worldwide x86 microprocessor unit sales in seven of the last eight years. Since 1999, AMD's worldwide volume share has hovered at 15%, only once penetrating barely the 20% level.

28.     Intel's x86 family of microprocessors does not face any meaningful competition other than from AMD.  There are huge barriers to entry in the relevant market.  A chip fabrication plant ("fab") capable of efficiently mass-producing x86 microprocessors costs at least $2.5 to $3.0 billion. Any new entrant would need additional funds to underwrite huge research and development costs to design a competing x86 microprocessor and to overcome substantial  intellectual property and knowledge barriers.

## II.     CUSTOMERS FOR x86 MICROPROCESSORS

29.     Annual worldwide consumption of x86 microprocessors currently stands at just over 200 million units per year and is expected to grow by 50% over the remainder of the decade.  Most x86 microprocessors are used in desktop PCs and mobile PCs. Of the total worldwide production of computers powered by x86 microprocessors, 32% are sold to U.S. consumers; U.S. sales of AMD-powered computers account for 29% of AMD's production.

30.     The majority of x86 microprocessors are sold to a handful of large (Tier One) OEMs (original equipment manufacturers): Hewlett-Packard ("HP"), which now also owns Compaq Computer; Dell, Inc.; IBM, which as of May 1, 2005, sold its PC (but not server) business to Lenovo; Gateway/eMachines; and Fujitsu/Fujitsu Siemens. Toshiba, Acer, NEC and Sony are also commonly viewed as Tier One OEMs in the notebook segment of the PC market.

HP and Dell are the dominant companies, collectively accounting for over 30% of worldwide desktop and mobile sales, and almost 60% of worldwide server sales. HP, Dell, IBM and Gateway/eMachines are U.S.-based companies, and all but Gateway have U.S, manufacturing operations (as does Sony, which operates a North American production facility in San Diego).

31.     Worldwide, these Tier One OEMs collectively account for almost 80% of servers and workstations (specialty high-powered desktops), more than 40% of worldwide desktop PCs, and over 80% of worldwide mobile PCs.

32.     The balance of x86 microprocessors are sold to smaller system builders and to independent distributors. The latter, in turn, sell to smaller OEMs, regional computer assemblers, value-added resellers and other, smaller distributors. Currently, distributors account for over half of AMD's sales.

33.     OEMs have adopted a variety of business models, including sales directly to customers through web-based e-commerce, sales through company-employed sales staffs (who target IT professionals and Fortune 1000 companies) and sales through a network of independent distributors (who focus on smaller business customers). With the exception of Dell, which only markets to consumers directly (mostly over the internet), most OEMs also sell through retail chains. Intel and AMD compete not only to have OEMs incorporate their microprocessors into  retail platforms but also to convince retailers to allocate shelf-space so that the platforms containing their respective microprocessors can be purchased in the retailers' stores.

34.     The OEMs have largely become undifferentiated distributors of the Intel platform, offering "Intel Inside" and "Centrino" computers largely indistinguishable from those of their rivals. The "Intel Inside" and "Centrino" programs financially reward OEMs for branding their PCs as Intel machines. As their products have become commoditized, the Tier One OEMs operate on small or negative margins, and the overwhelming portion of PC profit flows to Intel. Therefore, OEM's are susceptible to Intel' s economic coercion, described below.

## INTEL'S UNLAWFUL PRACTICES

35.     Intel has maintained its x86 microprocessor monopoly through various financial and other exclusionary business strategies that in effect limit its customers' abilities and/or incentives to deal with AMD, including direct payments in return for exclusivity and near-exclusivity; discriminatory rebates, discounts and subsidies conditioned on customer loyalty that have the practical and intended effect of creating exclusive or near-exclusive dealing arrangements; threats of economic retaliation against those (a) who give, or even contemplate giving, too much of their business to AMD, (b) who refuse to limit their AMD business to Intel-approved models, brands, lines and/or sectors, or (c) who cooperate too closely with AMD's promotion of its competitive processors; and misuse of industry standards-setting processes so as to disadvantage AMD products in the marketplace.

36.     Intel has targeted customers to prevent AMD from building market share and to keep Intel's customers dependent on Intel for very substantial amounts of product. In this way, OEMs remain vulnerable to continual threats of Intel retaliation, AMD remains capacity-constrained, OEMs remain Intel-dependent, and Intel thereby perpetuates its economic hold over them, allowing it to continue to demand that customers curtail their dealings with AMD. By unlawfully exploiting its existing market share, Intel is impeding competitive growth of AMD, thereby facilitating the next round of foreclosing actions.  Consequently, AMD's ability to benefit from its current technological advances is curtailed to the harm of potential customers and consumers.

37.     The following is not an exhaustive list of Intel's relevant misconduct or unlawful acts, but provides as examples that AMD has reported.

## II.     PRACTICES DIRECTED AT OEMS

### A.     Exclusive and Near-Exclusive Deals

38.     **Dell**. Dell has not purchased a single AMD x86 microprocessor despite acknowledging Intel shortcomings and customer demands for AMD solutions, principally in the server sector. As Dell's President and CEO, Kevin Rollins, said publicly last February:

> Whenever one of our partners slips on either the economics for us
> and for them, or slips because of technology that causes us great
> concern...
>
> So for a while, Intel . . . slipped technologically, and AMD
> had made us step forward and we were seeing that in terms of
> customer response and requests . . ..

> Goldman Sachs Technology Investment Conference Symposium
> (Feb. 25, 2005), quoted in *Technology News*, "Intel In, AMD Out
> At Dell" (Feb. 25, 2005).

39.     Dell has been Intel-exclusive, as a result of payments and favorable discriminatory pricing and service. AMD reports that, in discussions about buying from AMD, Dell executives have frankly conceded that they must financially account for Intel retribution in negotiating pricing from AMD.

40.     **Sony**. In 1999, AMD's Athlon microprocessor began to make notable inroads into Intel's sales to major Japanese OEMs, which export PCs into the U.S. By the end of 2002, AMD had achieved an overall Japanese unit market share of approximately 22%. AMD has reported that, to reverse the erosion of Intel business, in 2003 Intel paid Sony multimillion dollar sums, disguised as discounts and promotional support, in exchange for microprocessor exclusivity; Sony abruptly cancelled an AMD Mobile Athlon notebook model; Sony cancelled plans to release AMD Athlon desktop and notebook computers; and, as a result, AMD's share of Sony's business dropped from 23% in 2002 to 8% in 2003, and then to 0%, where it remains today. In proceedings brought by the JFTC, Intel has accepted the JFTC charges of misconduct with respect to Sony.

41.     **Toshiba**. AMD has reported that Toshiba was once a significant AMD customer, but dropped AMD after receiving a very substantial payment from Intel in 2001 not to use AMD processors, and its executives agreed that Intel's financial inducements amounted to "cocaine," because dealing with AMD would jeopardize Intel market development funds estimated to be worth $25-30 million per quarter. AMD also reports that Toshiba made clear to AMD that the tens of millions of dollars of additional marketing support was provided on the explicit condition that Toshiba could not use AMD microprocessors. In proceedings brought by the JFTC, Intel has accepted the JFTC charges of misconduct with respect to Toshiba.

42.    **NEC**. NEC bought nearly 40% of its microprocessors for notebooks and desktops from AMD in the first quarter of 2002. AMD has reported that, in May 2002, Intel agreed to pay NEC more than 300 million yen per quarter in exchange for caps on NEC's purchases from AMD; the caps assured Intel at least 90% of NEC's business in Japan; the caps established an overall worldwide quota on NEC's AMD dealings; NEC made clear to AMD that AMD's  Japanese share must stay in the single digits pursuant to NEC's agreement with Intel; and, while AMD had maintained an 84% share of NEC's Japanese consumer desktop business in the third quarter of 2002, after the payments, AMD's share quickly plummeted to virtually zero in the first quarter of 2003.  Worldwide, AMD's share fell from nearly 40% to around 15%, where it stands today. In proceedings brought by the JFTC, Intel has accepted the JFTC charges of misconduct with respect to NEC.

43.    **Fujitsu**. AMD has reported that, in the summer of 2002, Fujitsu informed AMD that Intel had pressured Fujitsu to remove Fujitsu's AMD-powered desktop models from Fujitsu's website (and Fujitsu complied by making any potential AMD-buyer click past Intel products to get to the AMD offerings); in early 2003, Intel offered an undisclosed package of financial incentives in return for Fujitsu's agreement to restrict its dealings with AMD; and Fujitsu's catalog currently limits AMD to a single notebook product. In proceedings brought by the JFTC, Intel has accepted the JFTC charges of misconduct with respect to Fujitsu.

44.    **Hitachi**. AMD has reported that Intel purchased an exclusive-dealing arrangement with Hitachi (which had been a substantial AMD customer); and the agreement caused AMD's Hitachi business to fall precipitously (for example, during the first part of 2002, AMD was shipping 50,000 Athlon microprocessors to Hitachi per quarter, but by the middle of the year, AMD sold no microprocessors to Hitachi.) In proceedings brought by the JFTC, Intel has accepted the JFTC charges of misconduct with respect to Hitachi.

45.    **Gateway/eMachines**. From 2001 to 2004, Gateway was exclusively Intel. In 2001, former Gateway CEO, Ted Waitt, explained to an AMD executive that Intel offered him large sums not to deal with AMD, which he could not refuse. Gateway's press release

announcing its Intel exclusivity came within weeks of similar public announcements of Intel exclusivity by both IBM and Micron.

46.     **Supermicro**. AMD has reported that Supermicro historically did not buy from AMD, but when Supermicro finally agreed last year to begin developing an Opteron-powered server; it took various steps to avoid Intel retaliation: it moved the AMD development to quarters behind Supermicro's main manufacturing facility; it forbade AMD from publicizing the product or beginning any marketing prior to product release; and, in April 2005, it restricted distribution of its newly-released Opteron-powered product to only sixty of its customers and promoted them with a brochure devoid of its name, labeled "secret and confidential."

47.     Such Intel dealings with OEMs are unlawfully exclusionary, have no pro-competitive justification and are intended to maintain its monopoly.

### B.     Product-Line, Channel Or Geographic Restrictions

48.     AMD has reported that Intel has also bought more limited exclusivity from OEMs in order to exclude AMD from the most profitable lines or from channels of distribution best tailored to take advantage of AMD's price/performance advantage over Intel. By paying discriminatory discounts, subsidies or payments, for example, Intel has largely foreclosed AMD from sales with respect to commercial desktop computers manufactured by the major OEMs who have not ceded total exclusivity to Intel. The following are representative examples of such Intel misconduct reported by AMD.

49.     **HP**. In 2002, HP demanded a $25 million quarterly fund to compensate it for Intel's expected retaliation. To break into the commercial market, and to earn a place in HP's successful "Evo" product line, AMD agreed instead to provide HP with the first million microprocessors for free in an effort to overcome Intel's financial hold over HP. On the eve of the launch, HP disclosed its plan to Intel, which told HP it considered AMD's entry into HP's commercial line a "Richter 10" event, according to AMD. AMD has reported Intel immediately pressured HP into (1) withdrawing the AMD offering from its premier "Evo" brand, and (2) withholding the AMD-powered computer from HP's network of independent value-added resellers, HP's principal point of access to small business users for whom the computer was

designed in the first place. As a result of Intel's coercion, the HP-AMD desktop offering was unsuccessful, and HP ended up taking only 160,000 of the million microprocessors AMD offered for free. As of today, HP's AMD-equipped commercial desktops remain channel-restricted, and AMD's share of this business remains insignificant.

50.    AMD also reports the following with respect to Intel exclusivity on HP's most popular notebook line. HP captured 15% of the U.S. retail market last Christmas with an Intel-powered 14.1 "display notebook (the "DV 1000") with a popular power saving feature called Quick Play. When AMD sought to convince HP to carry a similar AMD-powered notebook, HP declined. It explained that Intel had paid between $3 and $4 million to lock up this product line for at least one year.

51.    **Gateway.** AMD has reported the following with respect to its limited success attempting to revive, after Gateway's 2004 merger with eMachines, the relationship it had with Gateway until 2001.  While Gateway built one AMD-powered desktop model at the request of Circuit City, AMD remains locked out entirely of Gateway's direct internet sales, its commercial offerings and its server line. According to Gateway executives, Gateway has paid a high price for even its limited AMD dealings, claiming that Intel has beaten them into "guacamole" in retaliation.

52.    **IBM**. AMD has reported the following with respect to its negotiations with  IBM, beginning in August 2000, over a proposed commercial PC business partnership and other business opportunities with IBM. After seven months and with a deal nearing completion, Intel approached IBM with an incentive-based program under which Intel would become IBM's "preferred supplier" – exclusive supplier -- for processors in commercial products. IBM accepted Intel's proposal and terminated discussions with AMD. In return for that exclusivity, according to IBM executive Ed Thum, Intel paid IBM millions of dollars in market development funds.

53.    Intel also acted to thwart AMD efforts to partner with IBM on servers. Although IBM joined AMD as a launch partner when it introduced its Opteron 64-bit server chip in April 2003 - signaling to the industry and IT professionals its confidence in the product - Intel soon dissuaded IBM from aggressively marketing Opteron servers. After investing heavily in its

design, IBM consigned its one Opteron computer model to a single target market segment (High Performance and Technical Computing). This was done, according to an industry report (confirmed by an IBM executive), because Intel paid IBM to shelve any further Opteron development. IBM also took Intel money in 2004 to scrap plans for a multiple-microprocessor Opteron server it had already designed and previewed with customers.

54.    Intel has also purchased IBM exclusivity in its "ThinkCentre" line of commercial desktops. When AMD pressed IBM to add an Athlon 64 model to its "ThinkCentre" roadmap, IBM executives explained that the move would cost them important Intel subsidies, and they declined.

55.    **Fujitsu**. AMD has reported that in 2002, Fujitsu and AMD formed an alliance to develop a low-power commercial notebook (FMV Lifebook MG Series) scheduled to go to market in the first quarter of 2003, which AMD spent over 20 million yen designing. Shortly before the launch, Fujitsu told AMD that Intel would not allow it to launch an AMD-powered commercial notebook, and the project died. To this day, AMD remains locked out of Fujitsu's commercial notebook lines. Intel's exclusionary conduct with Fujitsu extends beyond commercial notebooks. In the consumer space, for example, Intel purchased total exclusivity for Fujitsu's FM-Biblo NB consumer notebook line. When AMD tried to break Intel's lock on Fujitsu notebooks by offering to match any Intel discount, Fujitsu made clear that there was no price AMD could pay because Intel simply would not allow it. To this day, AMD remains locked out of Fujitsu's Biblo line.

56.    **Fujitsu-Siemens**. AMD has reported the following conduct of Intel with respect to Fujitsu-Siemens, a European joint-venture, which had AMD chips powering over 30% of Fujitsu-Siemens' offerings in the consumer sector. In early 2003, Intel offered Fujitsu-Siemens a "special discount" on Celeron processors which Fujitsu-Siemens accepted in exchange for hiding its AMD computers on its website and removing all references to commercial AMD-powered products in the company's retail catalog.

57.    Intel has also succeeded in convincing Fujitsu-Siemens to impose market restrictions on its AMD-powered PCs. Its parent, Fujitsu, currently sells an AMD-equipped

Lifebook S2010, a commercial notebook, but only in the U.S. and Japan. Fujitsu-Siemens has declined AMD's plea to offer the machine in the European market as well. Similarly, Fujitsu-Siemens designed for the European market the FMC Lifebook MG Series notebook. But it refused to offer that computer in Asia or North America. Finally, although Fujitsu-Siemens produces an AMD commercial desktop, the Scenico, it refuses to advertise it on its website, offering it instead only as a build-to-order product. AMD's unit share of Fujitsu-Siemens' business recently fell below 30% for the first time in four years.

58.    **NEC**. AMD has reported that Intel interfered as to its business opportunities with respect to NEC as follows.  Honda Motor Company demanded that NEC supply it with servers powered by AMD's Opteron microprocessors. After underwriting the considerable expense of designing and manufacturing an Opteron server for Honda, NEC then inexplicably refused to market the product to any of its other customers.

59.    AMD has reported that there is no reason, other than Intel's coercion of the OEMs, for AMD's inability to exploit its products in lucrative sectors, particularly commercial desktops. The microprocessors that power them are identical to microprocessors in consumer computers, a sector in which AMD has won both praise and market share. The only material difference between the consumer and commercial segments is that many more system builders supply desktops to consumers, making it more difficult for Intel to control their microprocessor choice.

60.    Such Intel dealings with OEMs are unlawfully exclusionary, have no pro-competitive justification and are intended to maintain its monopoly.

**C.    Exclusionary Rebates**

61.    AMD has reported that Intel has also imposed on OEMs a system of first-dollar rebates that have the practical and intended effect of creating exclusive or near-exclusive dealing arrangements and artificially foreclosing AMD from competing for a meaningful share of the market. In general, the rebate schemes operate as follows: quarterly, Intel unilaterally establishes for each of its customers a target level of purchases of Intel microprocessors. If the customer achieves the target, it is entitled to a rebate on all of the quarter's purchases of all

microprocessors, generally in the neighborhood of 8-10% of the price paid. Intel provides the rebate in cash at the quarter's close. OEMs operate on thin margins, so qualifying for an Intel rebate frequently means the difference between reporting a profit or a loss in quarterly earnings.

62.    In contrast to "volume discounts" that sellers offer on a graduated and non-discriminatory basis to reflect cost efficiencies that accrue when dealing in larger quantities, Intel's is a system of "penetration" or "loyalty" rebates designed to exclude AMD from a substantial portion of the market. Intel intentionally sets a rebate trigger at a level of purchases it knows to constitute a dominant percentage of a customer's needs. It is able to develop discriminatory, customer-by-customer unit or dollar targets that lock that percentage (without ever referencing it) because industry publications accurately forecast and track anticipated sales and because OEM market shares - which industry publications also report weekly, monthly and quarterly - do not change significantly quarter to quarter.

63.    Intel's retroactive discounts can operate to price microprocessors so low that AMD is put at a competitive disadvantage it cannot overcome. AMD can only achieve significant sales if it offers a price that makes the customer indifferent between getting the Intel rebate and getting an overall equivalent deal on AMD microprocessors. AMD is forced to discount its price more than Intel just to match the Intel discount, because Intel's past predatory practices provide a significant base of assured demand which enables Intel to inexpensively spread its first-dollar discount. Importantly, this new base of demand - driven by the OEM's purchasing - will enable Intel to repeat its exclusionary practice when the next line of models is unveiled.

64.    At least in the short run, most if not all of the major OEMs must purchase significant Intel units (1) because AMD is too small to service all their needs while continuing to satisfy other customer demand; (2) because to meet customer expectations, OEMs must assure commercial computer buyers that specifications, including the microprocessor, will remain unchanged during the product's lifecycle; and (3) because Intel has encouraged end-users to specify that processors be of the same family among similar computers in one installation, as this is perceived to increase reliability (although technically this is not the case). Intel uses its

retroactive discounts to make its large, captive market share self-perpetuating. In any one quarter, AMD cannot economically match Intel's retroactive rebate because it competes for too small a share of the customer's volume over which to spread the dollars necessary to equal the customer's total Intel cost savings. As a result, it loses the business and thus goes into the next selling cycle with Intel imbedded in additional customer product over which Intel can spread its rebates. This serves again to artificially constrain AMD's opportunity to match Intel's ensuing round of retroactive discounts. Intel's inter-temporal leveraging of its market share effectively forecloses AMD from ever having a fair opportunity to compete.

65.    AMD has reported that Intel exacts a severe penalty from OEMs who fail to meet their targets. For example, during the fourth quarter of 2004, AMD succeeded in getting on the HP retail roadmap for mobile computers, and its products sold very well, helping AMD capture nearly 60% of HP's U.S. retail sales for the quarter. Intel responded by withholding HP's fourth quarter rebate check and refusing to waive HP's failure to achieve its targeted rebate goal. Instead, Intel allowed HP to make up the shortfall in succeeding quarters when HP promised Intel at least 90% of HP's mainstream retail business.

66.    AMD has reported that Intel has used a variety of variants of this basic rebate scheme, including, for example, discounted microprocessors rather than rebates or entitlements to purchase designated processors at a purported discount, enabling the customer to obtain favorable pricing on bundled products (e.g., a Centrino-series processor and chipset) and/or to receive product offerings not available to competitors.

67.    AMD has reported that Intel makes similar offers to smaller OEMs but they are generally unwritten, and Intel leaves undefined the consequences of failing to meet a target. Thus, a customer may lose its account with Intel and have to source future products from Intel distributors, which is both more expensive and provides less security of supply than direct purchase.

68.    All of Intel's rebate schemes are discriminatory and market-foreclosing. If the customer chooses to purchase any significant quantity of microprocessors from AMD, it will not qualify for its rebate, and its price will be higher on all the Intel processors it buys across the

board. By tailoring targets to each customer's size and anticipated volume, Intel locks up significant percentages of the market much more effectively and at a lesser cost to itself- but with greater harm to AMD and ultimately individual and commercial consumers - as compared to offering such rebates for comparable purchase levels to all customers on a nondiscriminatory basis.

69.     AMD has reported that Intel's use of retroactive rebates leads, in some cases, to predatory below-cost pricing on incremental sales, and Intel schemes can lead to incremental Intel units being offered to the OEMs for nothing, leaving AMD hopelessly boxed out.

70.     AMD has reported that even where Intel's prices are above cost on the incremental volumes and overall despite its retroactive rebate schemes, these rebates enable Intel to lower prices selectively in the contested market segment while maintaining higher prices in its captive market. For example, Intel can offer rebates which are granted across the entire volume of sales but which are triggered only if the OEM increases its purchases beyond the portion of its requirements which is captive to Intel. Indeed, Intel can even price above the "monopoly" level for the volumes below the benchmark and offer huge discounts for additional purchases knowing full well that the OEM will not buy less than the benchmark and, instead, source the overwhelming share of its purchases from Intel thereby qualifying for the putative rebate while at the same time denying AMD any reasonable volume opportunity.

71.     Intel's practices exacerbate normal impediments to entry and expansion since the use of retroactive rebates to limit AMD to a small share of an OEM's business increases the obstacle to inducing the OEM to launch AMD-powered platforms. OEMs incur substantial expense in designing and engineering a new computer, and make the investment only if they foresee a substantial chance of selling a sufficient volume to recoup it. Intel's rebate and other business strategies effectively cap the volumes of AMD-powered products that an OEM can sell.

72.     Such Intel dealings with OEMs are unlawfully exclusionary, have no pro-competitive justification and are intended to maintain its monopoly.

D.    **Threats of Retaliation**

73.    AMD has reported that Intel has also resorted to threats, intimidation and "knee-capping" to deter OEMs from dealing with AMD, in connection with the following: unilaterally reducing or withdrawing a discount, rebate or subsidy; imposing a discriminatory price increase on a disfavored customer; extending a price cut to that customer's competitor; or forcing retailers into dropping the customer's computers in favor of its competitor; delaying or dispute an allowance or rebate; and threatening to delay or curtail supplies of scarce processors or essential technical information.

74.    AMD has reported that in late 2000, for example, Compaq's CEO, Michael Capellas, disclosed that because of the volume of business he had given to AMD, Intel withheld delivery of server chips that Compaq desperately needed. Capellas informed an AMD executive that he had to stop buying AMD processors.

75.    AMD has reported that in 2002, Intel threatened to discontinue providing NEC with the technological roadmap of future Intel products if NEC did not convert its entire line of Value Star L computers to Intel microprocessors. Without that roadmap, NEC would be at a distinct competitive disadvantage. NEC succumbed and eliminated AMD from the Value Star L series in 2002 and 2003.

76.    AMD has reported that NEC's European subsidiary, NEC-CI, which operates NEC's European and non-Japanese Asian divisions, reported that Intel executives said they would destroy NEC-CI for engaging with AMD in the commercial desktop segment. Intel told NEC-CI's retailers that NEC-CI's AMD dealings could impair its ability to supply products to its customers, and when NEC-CI resisted the pressure, Intel imposed a discriminatory price increase.

77.    AMD has reported that AMD had been engaged in discussions with IBM about introducing an Opteron "blade" server, when IBM suddenly announced that any such product it distributed could not bear an IBM logo. When pressed for an explanation, IBM reported that it could not appear overly supportive of AMD server products because it feared Intel retaliation.

78.    Such Intel dealings with OEMs are unlawfully exclusionary, have no pro-competitive justification and are intended to maintain its monopoly.

E.    **Interference with AMD Product Launches**

79.    AMD has reported that Intel acted to undermine AMD's product launches by in the following ways, for example.

80.    Intel disrupted the September 23, 2003 launch schedule for AMD's Athlon64 by coercing Acer, Lenovo, NEC-CI and Best Buy.  For example, Intel caused Acer to reduce its participation. Following Acer commitments to support the AMD rollout, Intel CEO, Craig Barrett, visited Acer's Chairman, CEO and President in Taiwan to express to them Intel's concern and said Acer would suffer severe consequences if it publicly supported AMD's launch. The Barrett visit coincided with an unexplained delay by Intel in providing $15-20 million in market development funds owed to Acer.

81.    Intel also disrupted AMD's launch of its Opteron server chip, which was rolled out on April 22, 2003, with few in attendance and little industry support.

82.    Other companies that reported being intimidated from participating in the Opteron launch were MSI, Atipa, Solectron and Fujitsu-Siemens. Indeed, Intel representatives told Fujitsu-Siemens' executives in the weeks preceding the Opteron launch that if they attended they would be the only Tier One OEM showing its support as all of the others would back out. With the exception of IBM, Intel was right.

83.    AMD has reported other examples of Intel undermining AMD's marketing efforts. For example, IBM pulled its AMD-powered computers from the 2004 Palisades eServer and PC Show, citing a contractual agreement with Intel reportedly prohibiting it from endorsing those competitive products. And at the 2004 Super Computing Show, an annual conference devoted to high performance computing, Intel offered two other AMD customers money to remove AMD systems from their booths. At CeBit, Intel threatened to pull a half million dollars of support from Fujitsu-Siemens for displaying AMD products (which were removed).

84.    Such Intel dealings with OEMs are unlawfully exclusionary, have no pro-competitive justification and are intended to maintain its monopoly.

**F.    Product Bundling**

85.    Intel also uses product bundling as an exclusionary weapon in a variety of ways. Intel's most common deployment is in bidding for a new OEM platform: it bundles microprocessors with free (or heavily discounted) chipsets or motherboards, often offered in amounts exceeding the OEM's requirements for the new platform. (The excess, of course, is only compatible with Intel processors, thereby providing the OEM a strong inducement to go with Intel rather than AMD on uncommitted models.). AMD does not sell chipsets or motherboards; they are provided by independent suppliers such as ATI, nVidia and Via which incur their own costs and control their own pricing. Hence, to match Intel's bundled microprocessor-chipsets-motherboards offer, AMD must extend a discount on its microprocessors that will not only match any Intel discount on the microprocessors themselves but also will compensate the OEM for the savings it will lose on independent Intel chipset and motherboard purchases. The additional compensation AMD is forced to provide through a discount on the sale of microprocessors alone makes AMD's sale of microprocessors potentially unremunerative, and it also enables Intel to avoid competing with AMD directly on microprocessor price and quality by imposing disproportionate burdens on AMD that are wholly unrelated to AMD's product quality which, as has been demonstrated, is frequently superior to that of Intel's.

86.    AMD has reported that Intel has also engaged in conduct concerning chipset pricing in retaliation for dealing with AMD. For example, in 2003, Acer had committed to launch the AMD Athlon XP and had been working with AMD to bring the product to market post-launch. But, on the eve of the launch the Acer management in Taiwan pulled the plug. AMD learned from Acer executives that Intel had threatened to raise chipset prices by $10 on all Intel-based Acer systems if any processor business was awarded to AMD outside of Europe.

87.    Such Intel dealings with OEMs are unlawfully exclusionary, have no pro-competitive justification and are intended to maintain its monopoly.

**III.    PRACTICES DIRECTED AT DISTRIBUTORS**

88.    Intel has also acted to restrict distributors from carrying AMD processors or selling AMD products into markets it deems strategic. AMD has reported, for example, that

Intel entered into an exclusive deal with one of the largest U.S. distributors, Synnex. Given Intel's 80% plus market share, there is no pro-competitive justification for this arrangement.

89.    AMD has reported that Intel offers discounts and rebates to distributors on the condition that they not do business with AMD, either worldwide or in strategic sub-markets. For example, in December 2004, Ingram Micro, Intel's biggest distributor in China, suddenly cut off discussions to distribute AMD chips. A high-ranking Ingram Micro official later reported to AMD that Ingram Micro had no choice because Intel proffered loyalty rebates that were too lucrative to pass up.

90.    Intel also offers a panoply of special programs for distributors who carry Intel microprocessors exclusively: marketing bonuses, increased rebates, credit programs for new customers (credits that can be used for all products from Intel and any other suppliers), payment for normal freight charges, and special inventory assistance, such as credits to offset inventory costs.

91.    Intel also offers retroactive rebates triggered when a distributor reaches a prescribed buying quota. Intel does not tell distributors the goals Intel has set for them or the precise consequences of failing to meet them.  As a result, every AMD chip they purchase, they buy at their peril.

92.    Such Intel dealings with distributors are unlawfully exclusionary, have no pro-competitive justification, and are intended to maintain its monopoly.

## IV.    PRACTICES DIRECTED AT RETAILERS

93.    In both the U.S. and internationally, approximately one fifth of desktop and notebook computers is purchased at retail stores. A handful of retailers dominate the U.S. PC market: Best Buy and Circuit City are the largest. Other significant but smaller retailers are Walmart/Sams Club, Staples, Office Depot and Office Max.

94.    Most of the PCs sold at retail are sold during four or five "buying seasons" that correspond to events on the calendar ("Dads and Grads," "Back to School," "Holiday," etc.), and retailers refresh their inventory for each. A chipmaker faces a two-step process to get its platform on retail shelves: first, it must convince one or more OEMs to build machines using its

microprocessor at a suggested price point (called "getting on the roadmap"); and second, it must convince the retailer to stock and devote shelf space to these machines. The major retailers demand market development funds ("MDF") in exchange for shelf space. MDF can consist of cooperative advertising support, but more frequently it comprises a marketing-related opportunity that a chipmaker must buy for tens of thousands of dollars, for example, space in a Sunday circular, an in-store display or an internet training opportunity with the chain's sales staff. The MDF required to secure shelf space can run as high as $25 per box depending on the computer price point and how much the competing chipmakers want the shelf space.

95.    Intel has historically enjoyed an advantage over AMD at retail because, using many of the strategies described above, it has had greater access to the OEMs' roadmaps and the ability to exert pressure to keep AMD out of their product plans. Also, it has significantly greater financial resources with which to buy retail shelf space.

96.    But to leverage those advantages, Intel has also made exclusive deals with many key retailers.  AMD has reported, for example, that until recently Office Depot declined to stock AMD-powered notebooks regardless of the amount of MDF AMD offered, citing its "premier" status with Intel that would be put at risk. When Intel learned that Fry's (Fujitsu's only retailer in the United States) was very successfully marketing a Fujitsu's Athlon XP-based notebook, it offered Fry's a large payment to remove it from its shelves.

97.    AMD has been entirely shut out from Media Markt, Europe's largest computer retailer, which accounts for 35% of Germany's retail sales. Intel provides Media Markt between $15-20 million of MDF annually, and since 1997 Media Markt has carried Intel computers exclusively. Intel subsidies also foreclose AMD from Aldi, a leading German food retail chain, whose PC sales account for an additional 15-20% of the German market.

98.    In the United Kingdom, Intel has locked up substantially all of the business of DSG (Dixon Services Group), operator of three major chains, including Dixon and PC World that collectively account for two thirds of the U.K. PC market. In exchange for Intel payments, DSG has agreed to keep AMD's share of its business below 10%. Like Media Markt, DSG reports that Intel penalizes it with reduced MDF just on account of the small amount of

business it does with AMD. Toys'R'Us in the U.K. is also exclusive to Intel. Time, another U.K. retailer (which builds computers as well), took a substantial MDF payment from Intel in exchange for near-exclusivity on notebooks during the first half of 2004, and it reports that Intel has withheld discounts because Time has introduced too many AMD Athlon64 desktop models. In France, Intel has brought pressure on the largest retailers, causing them to cease dealing with AMD or drastically reduce their AMD business.

99.    AMD has nonetheless made some progress in gaining retail market share. Because of price/performance advantages, which are key in retail, OEMs build approximately 15 % of their U.S. domestic market desktops with AMD processors; within notebook roadmaps, AMD represents approximately 10%. On a shelf-space to sales basis, AMD has generally outperformed Intel, obtaining a larger percentage of sales than the AMD percentage of shelfspace. These numbers confirm that AMD's products perform well at retail, provided that space is available.

100.    AMD has reported that, in order to counteract this, Intel instituted a rebate program where Intel provides full MDF payments to retailers, such as Best Buy and Circuit City, only if they agree to limit to 20% not just the shelf space devoted to AMD- based products, but also the share of revenues they generate from selling AMD platforms. If AMD's share exceeds 20%, the offending retailer's marketing support from Intel is cut by 33% across all products. Even if AMD were to compete for significant sales, AMD would have to offer more MDF than Intel -- because it has far fewer units over which to spread the difference.

101.    AMD has reported that Intel has also threatened retailers to gain preferred treatment. For example, at the recent CeBit computer show in Hanover, Germany (the largest computer show in the world), a German chain, Vobis, hung an AMD Turion64 banner from its booth as part of a co-marketing agreement with AMD and its OEM partner (Yakamo) to announce AMD's new mobile microprocessor. Intel's German general manager and its vice president for mobile products demanded that the Turion64 banner be removed. When Vobis' CEO declined, the Intel representatives threatened immediately to stop microprocessor shipments to Vobis' supplier. The banner was removed before the CeBit show opened.

102.    Intel's dealings with retailers are unlawfully exclusionary, have no pro-competitive justification, and are intended to maintain its monopoly.

## V.    INTEL'S STANDARD SETTING AND OTHER TECHNICAL ABUSES

### A.    Intel's Exclusion of AMD from Industry Standards

103.    AMD has reported that Intel has employed, and continues to employ, a variety of tactics that have the purpose and effect of excluding and/or hampering AMD's full and active participation in the development of important industry standards to ensure broad compatibility and of denying AMD timely access to such standards. Intel's efforts have hampered AMD's ability to vigorously compete in the market.

104.    By way of example, Intel and AMD each develop and manufacture memory controller technologies that allow their processors and related components to communicate with memory. Intel designs and manufactures an entirely separate chip for this purpose, known as the Graphics and Memory Controller Hub, but AMD embeds its memory controllers directly into its processors, thus dispensing with the need for an extra chip and speeding up communication. Both companies need to know and have access to memory standards well in advance of producing their processors and/or chipsets so that their memory controller designs will be compatible with the next generation of memory devices.

105.    AMD has reported that Intel is excluding AMD by avoiding an open standard-setting committee. Intel is currently coercing the major memory producers into signing non-disclosure agreements and working exclusively with Intel in a secret committee to develop the next generation memory interface standard. Once under this agreement, the memory manufacturers are prohibited from sharing information about their own product designs implementing the memory interface standard. This has the effect of preventing AMD from completing the design of its processor memory controllers until Intel permits memory manufacturers to communicate their interface specifications to the industry.

106.    By this scheme, Intel tightens its control over the industry by converting what the component manufacturers intend as a public standard into a proprietary one, and thereby guarantees itself an undeserved head-start and unfair competitive advantage.

**B.    Intel's Leveraging of Its Other Product Lines to Unfairly Disadvantage AMD in the Marketplace**

107.    AMD has reported that Intel has also designed and marketed microprocessor-related products with the goal of compromising performance for those who opt for AMD solutions, even if it requires sacrificing its own product quality and integrity.

108.    An example is Intel's compilers. Generally, independent software vendors ("ISVs") write software programs in high-level languages, such as C, C++, or Fortran. Before these programs can be understood by a computer system, they must be translated into object code - a machine-readable language - by a software program called a compiler. Different companies write compilers for different operating systems (Windows, Linux, etc.) and for different programming languages (C, C++, Fortran, etc.). Intel offers compilers for use with a variety of different operating systems and programming languages.

109.    Intel's compilers are designed to perform specialized types of optimizations that are particularly advantageous for ISVs developing software programs that rely heavily upon floating point or vectorized mathematical calculations. Such programs include, for example, mathematical modeling, multimedia, and video game applications.

110.    AMD has reported that Intel has designed its compiler purposely to degrade performance when a program is run on an AMD platform. To achieve this, Intel designed the compiler to compile code along several alternate code paths. Some paths are executed when the program runs on an Intel platform and others are executed when the program is operated on a computer with an AMD microprocessor. (The choice of code path is determined when the program is started, using a feature known as "CPUID" which identifies the computer's microprocessor.) By design, the code paths were not created equally. If the program detects a "Genuine Intel" microprocessor, it executes a fully optimized code path and operates with the maximum efficiency. However, if the program detects an "Authentic AMD" microprocessor, it executes a different code path that will degrade the program's performance or cause it to crash.

111.    ISVs are forced to choose between Intel's compilers, which degrade the performance of their software when operated with AMD microprocessors, or third-party

compilers, which do not contain Intel's particular optimizations. Sadly for AMD and its customers, for legitimate reasons Intel's compilers appeal to certain groups of ISVs, especially those developing software programs that rely heavily on floating point and vectorized math calculations. Unbeknownst to them, performance of their programs is degraded when run on an AMD microprocessor not because of design deficiencies on the part of AMD, but Intel's unlawful and unfair conduct.

### EFFECTS OF INTEL'S MISCONDUCT

112.    Intel's unlawful conduct has caused and will continue to cause substantial harm to competition in the market for x86 microprocessors in domestic, import, and export trade. Were it not for Intel's acts, AMD and other competitors would be able to compete for microprocessor business on competitive merit, both domestically and internationally, bringing customers and end-product individual and commercial consumers lower prices, enhanced innovation, and greater freedom of choice.

113.    Intel's anticompetitive acts both inside and outside the territorial boundaries of the United States have a direct, substantial, and reasonably foreseeable effect on United States trade and commerce. In maintaining its monopoly by unlawfully denying rivals a competitive opportunity to achieve minimum levels of efficient scale, Intel necessarily excludes them from the product market worldwide.

114.    Intel's violations of the Sherman Act have caused and will continue to cause substantial harm to the business of AMD and other Intel competitors. in the form of artificially constrained market share, lost profits and increased costs of capital. This conduct caused, and causes, substantial harm to purchasers of Intel-powered PC's, in that they paid and pay higher prices for their PC's than they would have paid absent Intel's misconduct.  These harms are evidenced by the following:

115.    Intel's exclusionary conduct has successfully boxed AMD out of the notebook sector. Its exclusive deals with Dell, Sony and Toshiba alone bar AMD from a third of the world market and half of U.S. domestic sales. Intel's economic coercion and rebates have foreclosed AMD from an appreciable share of the remainder.

116.    AMD's Athlon64 is widely recognized as fully competitive with Intel's best desktop offering, with the added benefit that it can run 64-bit software. Nonetheless, with the exception of a channel-restricted HP machine and a single Fujitsu-Siemens' model, AMD has failed to get a single major OEM -- which collectively dominate the lucrative commercial desktop sector -- to launch broadly an Athlon64 commercial desktop. Fortune 500 companies won't take a chance on AMD unless it partners with a Tier One desktop OEM, but Intel' s exclusionary conduct, including its economic coercion of Dell, HP, IBM, Gateway and Acer, prevents that from happening. As a result, AMD's commercial desktop share is no greater now than it was in 2002.

## CLASS ACTION ALLEGATIONS

117.    Plaintiffs bring this suit as a class action pursuant to Rules 23(b)(2) and 23(b)(3) of the Federal Rules of Civil Procedure, on behalf of themselves and a Plaintiff Class ("the Class") composed of and defined as follows:

> All persons and entities residing in the United States who purchased in the last four years a microprocessor in the United States indirectly from Intel. Specifically excluded from this Class are Intel; the officers, directors or employees of Intel; any entity in which any has a controlling interest; and any affiliate, legal representative, heir or assign of Intel. Also excluded are any federal, state or local governmental entities, any judicial officer presiding over this action and the members of his/her immediate family and judicial staff, and any juror assigned to this action.

118.    This action has been brought and may be properly maintained as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure for the following reasons:

a.    The Class is ascertainable and there is a well-defined community of interest among the members of the Class;

b.    Based upon the nature of the trade and commerce involved and the number of indirect purchasers of Intel-powered computers, plaintiffs believe that the members of the Class number in the thousands, and therefore is sufficiently numerous that joinder of all Class members is not practicable;

c.    Plaintiffs' claims are typical of the claims of the members of the Class because plaintiffs indirectly purchased an Intel microprocessor from Intel or its

coconspirators, and therefore plaintiffs' claims arise from the same common course of conduct giving rise to the claims of the members of the class and the relief sought is common to the Class;

        d.     The following common questions of law or fact, among others, exist as to the members of the Class:

        i.     whether Intel formed and operated a combination or conspiracy to fix, raise, maintain or stabilize the prices of, or allocate the market for, microprocessors;

        ii.     whether Intel's behavior caused microprocessor prices to be higher than they would have been in the absence of Intel's conduct;

        iii.     what is the operative time period of Intel's combination or conspiracy;

        iv.     whether Intel's conduct caused injury to the business or property of plaintiffs and the members of the Class;

        v.     the appropriate measure of the amount of damages suffered by the Class;

        vi.     whether Intel's conduct violates Sections 1 or 2 of the Sherman Act;

        vii.     whether Intel's conduct violates Section 3 of the Clayton Act.

        viii.     whether Intel's conduct violates Sections 16720 or 17200 of the California Business and Professions Code;

        ix.     whether Intel's conduct constitutes illegal monopolization under California common law;

        x.     whether Intel's conduct violates Sections 16727, 17045, 17046, 17047 or 17048 of the California Business and Professions Code;

        xi.     whether Intel's conduct violates the antitrust, unfair competition, and consumer protection laws of the other states as alleged below; and

xii.    whether Intel has been unjustly enriched by its anticompetitive behavior.

e.    These and other questions of law or fact that are common to all members of the Class predominate over any questions affecting only individual members of the Class;

f.    After determination of the predominant common issues identified above, if necessary of appropriate, the Class can be divided into logical and manageable subclasses;

g.    Plaintiffs will fairly and adequately protect the interests of the Class in that plaintiffs have no interests that are antagonistic to other members of the Class and have retained counsel competent and experienced in the prosecution of class actions and antitrust litigation to represent themselves and the Class;

h.    A class action is superior to other available methods for the fair and efficient adjudication of this litigation since individual joinder of all damaged Class members is impractical. The damages suffered by individual Class members are relatively small, given the expense and burden of individual prosecution of the claims asserted in this litigation. Thus, absent the available of class action procedures, it would not be feasible for Class members to redress the wrongs done to them. Even if the Class members could afford individual litigation, the court system could not. Further, individual litigation presents the potential for inconsistent or contradictory judgments and would greatly magnify the delay and expense to all parties and to the court system. Therefore, the class action device presents far fewer case management difficulties and will provide the benefits of unitary adjudication, economy of scale and comprehensive supervision by a single court;

i.    Intel has acted, and refused to act, on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole; and

j.    In the absence of a class action, Intel would be unjustly enriched because it would be able to retain the benefits and fruits of its wrongful conduct.

119.    The Claims in this case are also properly certifiable under the laws of the State of California, and of the other individual states identified below in the Claims for Relief.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### Violation of Sherman Act Section 1

120.    Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate, as if fully alleged herein, each of the allegations contained in the preceding paragraphs of this complaint, and further allege against Intel as follows.

121.    Beginning at least as early as July 11, 2001, and continuing thereafter at least up to and including the present, the exact dates being unknown to plaintiffs, Intel and various co-conspirators entered into and engaged in continuing contracts, combinations, and conspiracies in restraint of the trade and commerce described above in the United States in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.  The contracts, combinations and conspiracies are continuing and will continue unless enjoined.

122.    For the purpose of effectuating the contracts, combinations and conspiracies, Intel and its co-conspirators did those thing that they conspired to do, including but not limited to those acts alleged above, and, for example: (a) entered arrangements for exclusive and near-exclusive dealing; (b) entered arrangements for secret funding, rebates and discounts; (c) monitored and controlled the activities of AMD customers, sanctioning those who acted contrary to the interests of Intel and its co-conspirators; and (d) employed other mechanisms also designed to divert sales and customers away from AMD or other competitors. As a result, purchasers of x86 microprocessors have been deprived of free and open competition, and forced to pay supra-competitive prices.

123.    In formulating and carrying out the alleged contracts, combinations, and conspiracies, Intel and its co-conspirators engaged in anticompetitive activities, the purpose and effect of which were and are (a) to artificially raise, fix, maintain, or stabilize the prices of x86 microprocessors; (b) to allocate among themselves microprocessor production, markets and customers; and/or (c) to control supply.

124.    The illegal contracts, combinations and conspiracies alleged herein had the following effects, among others:

a.    Price competition in the sale of x86 microprocessors has been restrained, suppressed, and/or eliminated in the United States;

b.    Prices for Intel x86 microprocessors have been fixed, raised, maintained and stabilized at artificially high, noncompetitive levels throughout the United States; and

c.    Those who purchased x86 microprocessors indirectly from Intel have been deprived of the benefits of free and open competition.

125.    As a direct and proximate result of the illegal contracts, combinations and conspiracies, Plaintiffs and the members of the Class have been injured, and will continue to be injured, in their business and property by paying more for x86 microprocessors purchased indirectly from Intel than they would have paid and will pay in the absence of the illegal contracts, combinations and conspiracies (including paying more for personal computers and other products in which x86 microprocessors are a component as a result of higher prices paid for x86 microprocessors by the manufacturers of those products).

126.    Plaintiffs and the Class are entitled to an injunction pursuant to Section 16 of the Clayton Act against Intel, preventing and restraining the continued unlawful conduct.

## SECOND CLAIM FOR RELIEF

### Violations of California's Tort Law Against Monopoly

127.    Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate, as if fully alleged herein, each of the allegations contained in the preceding paragraphs of this complaint, and further allege against Intel as follows.

128.    Intel's business acts and practices were centered in, carried out, effectuated and perfected mainly within the State of California, and Intel's conduct within California injured all members of the Class throughout the United States. Therefore, this claim for relief under California law is brought on behalf of all members of the Class, whether or not they are California residents.

129.    By virtue of the conduct described above, Intel has engaged in tortious and unlawful monopolization of the x86 microprocessor market.

130.    Such conduct gives rise to a cause of action for common law monopoly under California law.

131.    As a direct and proximate result of Intel's acts of monopolization alleged herein, Plaintiffs and the members of the Class have suffered actual damages in an amount to be proven at trial.

132.    Intel's acts of monopolization described herein were intended to monopolize and suppress competition in the relevant market of x86 microprocessors and to injure consumers. Intel's acts included acts of fraud, malice and oppression, and were undertaken with conscious disregard of the rights of individual and commercial consumers, including Plaintiffs and members of the Class.  An award of punitive damages is justified to make an example of Intel, to punish Intel, and to deter it and others from engaging in the same or similar conduct.  Plaintiffs and members of the Class seek an award of punitive damages in an amount according to proof at trial.

### THIRD CLAIM FOR RELIEF

### Violation of the California Cartwright Act

133.    Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate, as if fully alleged herein, each of the allegations contained in the preceding paragraphs of this complaint, and further allege against Intel as follows.

134.    Intel's unlawful conduct was centered in, carried out, effectuated and perfected mainly within the State of California, and Intel's conduct within California injured all members of the Class throughout the United States.  Therefore, this claim for relief under California law is brought on behalf of all members of the Class, whether or not they are California residents.

135.    Intel and its co-conspirators entered into and engaged in continuing unlawful combinations, trusts, agreements, understandings and concert of action in restraint of

the trade and commerce described above in violation of the Cartwright Act, section 16720 of the California Business and Professions Code.

136.    For the purpose of effectuating the alleged combinations, trusts, agreements, understandings and concert of action, Intel and its co-conspirators did those things that they conspired to do, including but not limited to those acts alleged above, and, for example: (a) entered arrangements for exclusive and near-exclusive dealing; (b) entered arrangements for secret funding, rebates and discounts; (c) monitored and controlled the activities of AMD customers, sanctioning those who acted contrary to the interests of Intel and its co-conspirators; and (d) employed other mechanisms also designed to divert sales and customers away from AMD or other competitors. As a result, purchasers of x86 microprocessors have been deprived of free and open competition, and forced to pay supra-competitive prices.

137.    In formulating and carrying out the alleged combinations, trusts, agreements, understandings and concert of action, Intel and its co-conspirators engaged in anticompetitive activities, the purpose and effect of which were and are (a) to artificially raise, fix, maintain, or stabilize the prices of x86 microprocessors; (b) to allocate among themselves microprocessor production, markets and customers; and/or (c) to control supply.

138.    The illegal combinations, trusts, agreements, understandings and concert of action alleged herein had the following effects, among others:

a.      Price competition in the sale of x86 microprocessors has been restrained, suppressed, and/or eliminated in the United States;

b.      Prices for Intel x86 microprocessors have been fixed, raised, maintained and stabilized at artificially high, noncompetitive levels throughout the United States; and

c.      Those who purchased x86 microprocessors indirectly from Intel have been deprived of the benefits of free and open competition.

139.    As a direct and proximate result of the illegal combinations, trusts, agreements, understandings and concert of action, Plaintiffs and the members of the Class have been injured, and will continue to be injured, in their business and property by paying more for

x86 microprocessors purchased indirectly from Intel than they would have paid and will pay in the absence of the illegal combinations, trusts, agreements, understandings and concert of action (including paying more for personal computers and other products in which x86 microprocessors are a component, as a result of higher prices paid for x86 microprocessors by the manufacturers of those products). They also were restricted in their choice of x86 microprocessors.

140.    As a result of Intel's and its co-conspirators' violation of Section 16720 of the California Business and Professions Code, Plaintiffs seek treble damages and the costs of suit, including reasonable attorneys' fees, pursuant to Section 16750(a) of the California Business and Professions Code.

## FOURTH CLAIM FOR RELIEF

### Violation of the California Unfair Competition Law

141.    Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate, as if fully alleged herein, each of the allegations contained in the preceding paragraphs of this complaint, and further allege against Intel as follows.

142.    Intel's unlawful conduct was centered in, carried out, effectuated and perfected mainly within the State of California, and Intel's conduct within California injured all members of the Class throughout the United States. Therefore, this claim for relief under California law is brought on behalf of all members of the Class, whether or not they are California residents.

143.    Intel committed and continues to commit acts of unfair competition, as defined by Sections 17200, *et seq*. of the California Business and Professions Code, commonly known as the Unfair Competition Law, by engaging in the acts and practices alleged above.

144.    Plaintiffs and the members of the Class bring this claim pursuant to Sections 17203 and 17204 of the California Business and Professions Code, to obtain restitution and/or disgorgement from Intel for acts alleged herein that violate the Unfair Competition Law.

145.    Intel's acts, omissions, misrepresentations, practices and non-disclosures, as alleged herein, constitute a continuous and continuing course of conduct of unfair competition

by means of unfair, unlawful and/or fraudulent business acts or practices within the meaning of California Business and Professions Code, Section 17200, *et seq.*, in that, for example:

   a. Intel's acts and practices violate Sections 1 and 2 of the Sherman Act (15 U.S.C. §§ 1 and 2);

   b. Intel's acts and practices violate Section 3 of the Clayton Act (15 U.S.C. §14);

   c. Intel's acts and practices violate Section 16720, *et seq.*, 16727, 17045, 17046, 17047, and 17048 of the California Business and Professions Code;

   d. Intel's acts and practices are unfair, unconscionable, unlawful or fraudulent whether or not its acts, omissions, misrepresentations, practices and nondisclosures, as described above, are in violation of Section 16720, *et seq.*, 16727, 17045, 17046, 17047, and 17048 of the California Business and Professions Code, and whether or not they are concerted or independent acts;

   e. Intel's acts and practices are unfair to consumers of x86 microprocessors in the State of California and throughout the United States, within the meaning of Section 17200 of the California Business and Professions Code; and

   f. Intel's acts and practices are fraudulent or deceptive within the meaning of Section 17200 of the California Business and Professions Code.

   146. The conduct of Intel as alleged in this Complaint violates Section 17200 of the California Business and Professions Code.

   147. The unlawful, unfair and fraudulent business practices of Intel, as described above, have caused and continue to cause Plaintiffs and the members of the Class to pay supra-competitive and artificially-inflated prices for x86 microprocessors, and restrict Plaintiffs' and the Class members' choices in the x86 microprocessor market. Plaintiffs and the members of the class suffered injury in fact and lost money or property as a result of such unfair competition.

   148. The illegal conduct alleged herein is continuing and there is no indication that the conduct will cease in the future.

149.    As alleged in this Complaint, Intel has been unjustly enriched as a result of it wrongful conduct and by Intel's unfair competition. Plaintiffs and the members of the Class are accordingly entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits which may have been obtained by Intel as a result of such business practices, pursuant to the California Business and Professions Code, Sections 17203 and 17204.

### FIFTH CLAIM FOR RELIEF

### Violations of State Consumer Protection Statutes

150.    Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate, as if fully alleged herein, each of the allegations contained in the preceding paragraphs of this complaint, and further allege against Intel as follows.

151.    Intel has engaged in unfair, unconscionable, deceptive or fraudulent acts or practices in violation of the state consumer protection statutes listed herein.

152.    Intel has engaged in unfair or deceptive acts or practices in violation of Alaska Stat. §§ 45.50.471, et seq.

153.    Intel has engaged in unfair or deceptive acts or practices in violation of Ariz. Rev. Stat. §§ 44-1521, et seq.

154.    Intel has engaged in unfair or deceptive acts or practices in violation of Ark. Code Ann. §§ 4-88-101, et seq.

155.    Intel has engaged in unfair or deceptive acts or practices in violation of Cal. Bus. & Prof. Code §§ 17200, et seq.

156.    Intel has engaged in unfair or deceptive acts or practices in violation of Colo. Rev. Stat. §§ 6-1-101, et seq.

157.    Intel has engaged in unfair or deceptive acts or practices in violation of Conn. Gen. Stat. §§ 42-110a, et seq.

158.    Intel has engaged in unfair or deceptive acts or practices in violation of Del. Code Ann. tit. 6 §§ 2511, et seq.

159.    Intel has engaged in unfair or deceptive acts or practices in violation of D.C. Code Ann. § 28-3901.

160.    Intel has engaged in unfair or deceptive acts or practices in violation of Fla. Stat. Ann. §§ 501.201, et seq.

161.    Intel has engaged in unfair or deceptive acts or practices in violation of Haw. Rev. Stat. §§ 480-1, et seq.

162.    Intel has engaged in unfair or deceptive acts or practices in violation of Idaho Code §§ 48-601, et seq.

163.    Intel has engaged in unfair or deceptive acts or practices in violation of 815 Ill. Comp. Stat. §§ 505/1, et seq.

164.    Intel has engaged in unfair or deceptive acts or practices in violation of Ind. Code §§ 24-5-0.5-1, et seq.

165.    Intel has engaged in unfair or deceptive acts or practices in violation of Kan. Stat. Ann. §§ 50-623, et seq.

166.    Intel has engaged in unfair or deceptive acts or practices in violation of Ky. Rev. Stat. Ann. §§ 367.110, et seq.

167.    Intel has engaged in unfair or deceptive acts or practices in violation of Me. Rev. Stat. Ann. tit. 5 §§ 205-A, et seq.

168.    Intel has engaged in unfair or deceptive acts or practices in violation of Md. Code Ann., Com. Law §§ 13-101, et seq.

169.    Intel has engaged in unfair or deceptive acts or practices in violation of Mass. Gen. Laws ch. 93A § 1, et seq.

170.    Intel has engaged in unfair or deceptive acts or practices in violation of Mich. Comp. Laws. §§ 445.901, et seq.

171.    Intel has engaged in unfair or deceptive acts or practices in violation of Minn. Stat. § 8.31.

172.    Intel has engaged in unfair or deceptive acts or practices in violation of Mo. Rev. Stat. §§ 407.010, et seq.

173.   Intel has engaged in unfair or deceptive acts or practices in violation of Neb. Rev. Stat. §§ 59-1601, et seq.

174.   Intel has engaged in unfair or deceptive acts or practices in violation of Nev. Rev. Stat. §§ 598.0903, et seq.

175.   Intel has engaged in unfair or deceptive acts or practices in violation of N.H. Rev. Stat. Ann. §§ 358-A:1, et seq.

176.   Intel has engaged in unfair, unconscionable or deceptive acts or practices in violation of N.J. Stat. Ann. §§ 56:8-1, et seq.

177.   Intel has engaged in unfair or deceptive acts or practices in violation of N.M. Stat. Ann. §§ 57-12-1, et seq.

178.   Intel has engaged in unfair or deceptive acts or practices in violation of N.Y. Gen. Bus. Law §§ 349, et seq.

179.   Intel has engaged in unfair or deceptive acts or practices in violation of N.C. Gen. Stat. §§ 75-1.1, et seq.

180.   Intel has engaged in unfair or deceptive acts or practices in violation of N.D. Cent. Code §§ 51-15-01, et seq.

181.   Intel has engaged in unfair or deceptive acts or practices in violation of Ohio Rev. Code Ann. §§ 1345.01, et seq.

182.   Intel has engaged in unfair or deceptive acts or practices or made false representations in violation of Okla. Stat. tit. 15 §§ 751, et seq.

183.   Intel has engaged in unfair or deceptive acts or practices in violation of Or. Rev. Stat. §§ 646.605, et seq.

184.   Intel has engaged in unfair or deceptive acts or practices in violation of Pa. Stat. Ann. tit. 73 §§ 201-1, et seq.

185.   Intel has engaged in unfair or deceptive acts or practices in violation of R.I. Gen. Laws §§ 6-13.1-1, et seq.

186.   Intel has engaged in unfair or deceptive acts or practices in violation of S.D. Codified Laws §§ 37-24-1, et seq.

187.    Intel has engaged in unfair or deceptive acts or practices in violation of Tenn. Code Ann. §§ 47-18-101, et seq.

188.    Intel has engaged in unfair or deceptive acts or practices in violation of Tex. Bus. & Com. Code Ann. §§ 17.41, et seq.

189.    Intel has engaged in unfair or deceptive acts or practices in violation of Utah Code Ann. §§ 13-11-1, et seq.

190.    Intel has engaged in unfair or deceptive acts or practices in violation of Vt. Stat. Ann. tit. 9 §§ 2451, et seq.

191.    Intel has engaged in unfair or deceptive acts or practices in violation of Va. Code Ann. §§ 59.1-196, et seq.

192.    Intel has engaged in unfair, deceptive or fraudulent acts or practices in violation of Wash. Rev. Code. §§ 19.86.010, et seq.

193.    Intel has engaged in unfair or deceptive acts or practices in violation of W. Va. Code §§ 46A-6-101, et seq.

194.    Intel has engaged in unfair or deceptive acts or practices in violation of Wis. Stat. §§ 100.20, et seq.

195.    Intel has engaged in unfair or deceptive acts or practices in violation of Wyo. Stat. Ann. §§ 40-12-101, et seq.

196.    Plaintiffs and members of the Class have been injured in their business and property by reason of Intel's unfair or deceptive acts or practices alleged in this claim for relief.  Their injury consists of paying higher prices than they would have paid in the absence of the conduct.  This injury is of the type the state consumer protection statutes were designed to prevent and directly results from Intel's unlawful conduct.

## SIXTH CLAIM FOR RELIEF

### Violations of State Antitrust and Unfair Competition Statutes

197.    Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate, as if fully alleged herein, each of the allegations contained in the preceding paragraphs of this complaint, and further allege against Intel as follows.

198.    Intel has restrained trade in violation of Alabama Code §§8-10-1 *et seq*.

199.    Intel has restrained trade in violation of Arizona Revised Stat. §§44-1401 *et seq*.

200.    Intel has restrained trade in violation of California Bus. & Prof. Code §§16700 *et seq*.

201.    Intel has restrained trade in violation of District of Columbia Code Ann. Code §§28-4503 *et seq*.

202.    Intel has restrained trade in violation of Iowa Code §§553.1 *et seq*.

203.    Intel has restrained trade in violation of Kansas Stat. Ann §§50-101 *et seq*.

204.    Intel has restrained trade in violation of Maine Rev. Stat. Ann., 10 §§1101 *et seq*.

205.    Intel has restrained trade in violation of Michigan Comp. Laws. Ann. §§445.773 *et seq*.

206.    Intel has restrained trade in violation of Minnesota Stat. §§325D.52 *et seq*.

207.    Intel has restrained trade in violation of Mississippi Code Ann. §§75-21-1 *et seq*.

208.    Intel has restrained trade in violation of Nebraska Rev. Stat. §§59-801 *et seq*.

209.    Intel has restrained trade in violation of Nevada Rev. Stat. Ann §§598A *et seq*.

210.    Intel has restrained trade in violation of New Mexico Stat. Ann. §§57-1-1 *et seq*.

211.    Intel has restrained trade in violation of North Carolina Gen. State. §§75-1 *et seq*.

212.    Intel has restrained trade in violation of North Dakota Cent. Code §§51-08.1-01 *et seq*.

213.    Intel has restrained trade in violation of Ohio Rev. Code Ann. §§1331.01 *et seq.*

214.    Intel has restrained trade in violation of Pennsylvania common law.

215.    Intel has restrained trade in violation of South Dakota Codified Laws Ann. §§37-1 *et seq.*

216.    Intel has restrained trade in violation of Tennessee Code Ann. §§47-25-101 *et seq.*

217.    Intel has restrained trade in violation of Vermont Stat. Ann. 9 §§2453 *et seq.*

218.    Intel has restrained trade in violation of West Virginia §§47-18-1 *et seq.*

219.    Intel has restrained trade in violation of Wisconsin Stat. §§133.01 *et seq.*

220.    As a direct and proximate result of the illegal combinations, trusts, agreements, understandings, concert of action, and restraints of trade alleged in this claim for relief, Class members in the states listed have been injured, and will continue to be injured, in their business and property by paying more for x86 microprocessors purchased indirectly from Intel than they would have paid and will pay in the absence of the illegal combinations, trusts, agreements, understandings, concert of action and restraints of trade (including paying more for personal computers and other products in which x86 microprocessors are a component, as a result of higher prices paid for x86 microprocessors by the manufacturers of those products). They also were restricted in their choice of x86 microprocessors.

221.    As a result of these violations, the Class members in the states listed seek treble damages and the costs of suit, including reasonable attorneys' fees.

### SEVENTH CLAIM FOR RELIEF

#### Unjust Enrichment

222.    Plaintiffs, on behalf of themselves and all others similarly situated, reallege and incorporate, as if fully alleged herein, each of the allegations contained in the preceding paragraphs of this complaint, and further allege against Intel as follows.

223.    Intel benefited from its unlawful acts through the receipt of overpayments that Plaintiffs and other Class members made.  It would be inequitable for Intel to be permitted to retain the benefit of these overpayments, which were conferred by Plaintiffs and other Class members and retained by Intel.

224.    Plaintiffs and members of the Class are entitled to the establishment of a constructive trust consisting of the benefit to Intel of such overpayments, from which Plaintiffs and the other Class members may make claims on a pro-rata basis for restitution.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray:

1.    That the Court determine that the Sherman Act, state antitrust law, and state consumer protection and/or unfair competition law claims alleged herein may be maintained as a class action under Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure;

2.    That the conduct alleged herein be adjudged and decreed to be:

a.    A restraint of trade or commerce in violation of Section 1 of the Sherman Act;

b.    A violation of California's tort law against monopolization;

c.    A violation of the Cartwright Act;

d.    An unlawful combination, trust, agreement, understanding, and/or concert of action in violation of the state antitrust laws;

e.    Violations of the state consumer protection and unfair competition laws; and

f.    Acts of unjust enrichment.

3.    That plaintiffs and the Class recover damages, as provided by federal and state antitrust laws, and that a joint and several judgment in favor of Plaintiffs and the Class be entered against Intel in an amount to be trebled in accordance with such laws;

4.    That Intel, its affiliates, successors, transferees, assignees, and the officers, directors, partners, agents, and employees thereof, and all other persons acting or claiming to act

on their behalf, be permanently enjoined and restrained from in any manner continuing, maintaining, or renewing the conduct alleged herein; from entering into any other contract, conspiracy or combination having a similar purpose or effect; and from adopting or following any practice, plan, program, or device having a similar purpose or effect;

5.    That Plaintiffs and members of the Class be awarded restitution, including disgorgement of profits obtained by Intel as a result of its acts of unfair competition and unjust enrichment;

6.    That Plaintiffs and members of the Class be awarded punitive damages with respect to their cause of action for common law monopolization;

7.    That Plaintiffs and members of the Class be awarded pre- and post-judgment interest, and that interest be awarded at the highest legal rate from and after the date of service of the initial complaint in this action;

8.    That Plaintiffs and members of the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law; and

9.    That Plaintiffs and members of the Class have such other, further, and different relief as the case may require and the Court may deem just and proper under the circumstances.

## DEMAND FOR TRIAL BY JURY

Pursuant to Fed. R. Civ. P. 38(b), plaintiffs demand trial by jury of all issues so triable under the law.

BOUCHARD MARGULES & FRIEDLANDER, P.A.

*James G. McMillan, III*

Joel Friedlander (Bar No. 3163)
James G. McMillan, III (Bar No. 3979)
222 Delaware Avenue, Suite 1400
Wilmington, DE 19801
(302) 573-3500
[jfriedlander@bmf-law.com]
[jmcmillan@bmf-law.com]
Attorneys for Plaintiffs

OF COUNSEL:

KIRBY McINERNEY & SQUIRE LLP
Daniel Hume
David Kovel
830 Third Avenue
New York, New York  10022
Telephone: (212) 371-6600

Dated:  July 8, 2005